## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  20-cr-30042-NJR |
| | ) | |
| CHRISTOPHER R. GRANT, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Now comes, The United States of America, by and through Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and Ali M. Summers, Assistant United States Attorney, who provides the government's Sentencing Memorandum.

**I.   INTRODUCTION:**

Chris Grant was a street-level drug dealer who used his home to hustle crack cocaine and marijuana. His residence had the usual trappings of a crack house – steel bars on the doors, shady characters lingering on the property, frequent traffic, visitors at all times of the day and night, and numerous high-powered firearms to protect the operation.

Nick Hopkins (Ex.1), on the other hand, was a young father and career Illinois State Police (ISP) Trooper. He was a fun-loving, gregarious, family man assigned to ISP's SWAT Team, which assisted with a state search warrant at Grant's house. Hopkins is entirely blameless. He did nothing more than dedicate his life to protecting and serving his community. And he was gunned down because of it.

In the simplest terms, this case illustrates why the law bans felons and drug dealers

from possessing firearms. In a more nuanced view, the case illustrates the gun and drug lifestyle, poverty, and how criminality spreads between generations. The case provides a contrast between a victim's life spent respecting the law, and an offender's life skirting it.

Nick's murder is an immeasurable loss that can never be made right. The best the Court can hope to do is impose a sentence in proportion to the gravity of the offense. And the gravity of this offense calls for a life sentence.

## II.   THE OFFENSE:

### A.  The Crime Scene

Grant maintained a drug involved premises on North 42nd Street, in East. St. Louis. The residence was an all-brick bungalow with a covered front porch. (Ex. 2) There were two front doors on the porch, and both were fortified with steel bars. (Ex. 3) Confidential sources, surveillance, and controlled drug purchases focused the police investigation on criminal activity occurring on the right side of the house.

Police later learned that the interior of the house had been modified into a duplex with a divider wall separating the two sides of the house. Chris Grant lived on the right side while Al Stewart Jr. lived on the left. On the morning of the murder, a female guest named J.G. spent the night with Al Stewart on the left side.

### B.  Search Warrant Preparations

Chris Grant regularly dealt cocaine and marijuana from his home, and this drug-involved premises caught the attention of the ISP. Agents conducted surveillance during three controlled drug purchases using a confidential informant who saw Grant protect

his drug activity with multiple firearms, including a .9mm handgun, an AK-47 style pistol, and an AR-15 style assault rifle.

Shortly before sunrise on August 23, 2019 the ISP prepared to execute a state search warrant at Grant's home. They knew the presence of handguns, assault rifles, drug activity, and a fortified residence made this a high-risk warrant. Therefore, ISP took extra precautions and activated their Special Weapons and Tactical (SWAT) Team.

The SWAT Team, drug investigators, supervisors, and various support personnel descended upon North 42nd Street in marked and unmarked patrol cars, a military-style armored "bearcat" tactical vehicle, and a Ford F350 diesel pickup truck.

First, ISP attempted to address the steel bars that safeguarded the front door. ISP officers drove the F350 diesel truck through the middle of the front yard and parked it in the grass facing the front of the house, with the engine running, and the headlights shining directly into the living room (where Grant happened to be sleeping on the couch). The truck was moved into this position so officers could connect chains from the Ford F350's front hitch to the steel bars protecting the door. After the chains were attached, ISP planned to assemble their entry team, use the truck to forcibly remove the steel bars from the door frame, and then execute the warrant.

Trooper Hopkins was assigned the task of connecting a chain from the F350 to the steel bars barricading the front door. Hopkins attached the chain hook to the bars covering the front door on the right side while two "cover officers" provided protection. The cover officers focused their attention on the windows on either side of the porch.

C. **The Murder**

Grant did not sleep in his bedroom that night. Rather, he later explained, he slept on the couch—beside a loaded, .9mm handgun with an extended magazine—because he had been robbed of drugs and money in the weeks leading up to August 23.  In response, he carefully loaded one of his many guns and slept in the front of the house so he would hear if someone broke in. In other words, Grant was prepared to shoot before he even went to sleep that night.

 The police commotion on the porch woke Grant from his sleep. Bright headlights were shining through the windows. He heard footsteps near his front door and noises consistent with the sound of a diesel engine. Grant had time to sufficiently assess the situation to know that someone was on his porch. But he did no more.

Instead, Grant immediately used deadly force—just as he had planned. He stood up, took a position just to the left of the door, and fired directly at Hopkins. (Ex. 4)[1] He did not: (1) look out of the living room window or the window in the front door to look to see who was present, (2) yell out or otherwise ask who was there, (3) yell a warning or demand that the person leave, (4) assess why so many vehicles were at his home, (5) turn on a light, (6) retreat to another room, (7) call his friend Al Stewart Jr., who shared the same front porch; (8) fire a warning shot; or (9) call 911.

---

1       The bullet was travelling basically parallel to the ground (at 85 degrees) and struck the door five feet above the floor. Grant is 5'6" tall. The bullet was travelling from left to right (at 65 degrees).

He claimed not to know who was present on his porch or why they were there. According to his statement, for all he knew, it could have been a drug customer, a relative, or the police. Nevertheless, he opened fire shooting three times directly at the person on his porch. His instincts were those of an armed drug dealer.

Grant used deadly force when he faced no threat of harm. He made no effort to identify who was on his porch or why they were there, even though he was inside a locked house, behind the added security provided by steel bars barricading the door. In fact, no one was there to harm him, and the police had not even attempted to enter his home when Grant opened fire. Grant was in no danger of any kind and his use of deadly force was entirely unlawful and unjustified.

Exhibit 5 shows the exterior of the locked wooden front door (right side) that was safeguarded behind the steel bars.

Tpr. Hopkins had just finished placing the chain's metal hook onto the steel bars protecting the front door, and he turned to walk down the steps to leave the porch. As he did, a small portion of the side of his head was exposed just as Christopher Grant fired three shots from his .9mm handgun.[2] One of those shots passed through the closed front door near the door knocker (Ex. 6 & 7) and struck Hopkins in the head, killing him. During the autopsy, wood fragments from the door were recovered inside Hopkins' skull along with the fatal bullet.

---

2       The other two shots must have passed through the glass, because there was only one hole in the front door and door frame.

ISP cover officers immediately returned directed fire[3] and deployed flash bangs[4] into the residence. While cover officers were trying to minimize the threat, other members of the SWAT Team tried to rescue Trooper Hopkins, who was unconscious on the porch. One officer drove the armored "bearcat" tactical vehicle towards the house for cover while others attempted to pull Hopkins to safety. He was immediately carried to a truck and rushed to St. Louis University Hospital. Exhibit 8 is a dashcam video of the event.

**D.  The Standoff and Eventual Surrender of Chris Grant**

The directed fire and flash bangs achieved their desired result, as no more shots came from the right side of the house. Officers maintained a secure perimeter, and they repeatedly demanded that all occupants come out of the house with their hands up.

There was no response. For 43 *long* minutes, police stood outside of the house in a standoff. They loudly and consistently demanded that the shooter surrender.

But no one came out of the right side where the shots originated. Finally, three people exited the door on the *left side* of the duplex. Al Stewart Jr., J.G., and Christopher Grant were all three taken into custody.

Police knew that the shooter had fired from the *right side* of the duplex, and so they immediately questioned all three trying to determine who had shot and whether anyone else remained in the building. Grant, Stewart, and J.G. all lied and denied knowing who had fired from inside the home. Grant falsely claimed that he had spent the night on the

---

3      Directed fire is a tactic to suppress enemy fire by sending many rounds into an attic or other general direction of the shooter to force the person to stop shooting and seek cover.
4      A flash bang is a concussion device that detonates with a loud noise and bright flash to disorient individuals without causing serious injury.

*left* side of the duplex, suggesting that the "real shooter" was still inside the duplex on the right side. Grant specifically denied being on the right side, and even gave the name of a well-known firearms offender he claimed to have seen on the right side, suggesting that person was the true shooter.

Stewart and J.G. went along with his lies.

Because of Grant's lies and obstructive conduct, police had good reason to fear that the shooter might still be barricaded inside the house, so they spent the next 14 hours taking extraordinary measures to secure the scene and search for another suspect. Dozens of officers and hundreds of man hours went into this goose chase. Eventually, ISP used a robot equipped with a camera to break through the front of the house so that they didn't have to risk the lives of additional officers making entry. The front of the home was razed, and the building was rendered uninhabitable after the substantial damage. (Ex. 9) The police response and resulting damage was entirely avoidable. It was occasioned solely because Grant misled them into believing that the "real shooter" was still in the house.

### E. Completion of the Investigation

Investigators eventually searched the house and saw that the two sides of the duplex were connected by a passage through the attic rafters. On the right-side of the house, investigators photographed a ladder propped directly underneath the attic pass through, which provided clear evidence that Grant had snuck across to the left side of the house before surrendering. Crime Scene Investigators recovered nine firearms and multiple

magazines of ammunition, as described in the presentence report. (Ex. 10) They also found evidence of marijuana cultivation and roughly $500 inside the house.

In the end, Grant admitted to being alone in the right side of the house all along. He also admitted to hiding guns in the basement during his standoff with police. He was not asked if he flushed other drugs down the toilet. Grant eventually confessed to firing the fatal shot from his Glock .9mm. His DNA was recovered from the murder weapon corroborating his confession.

III. **APPLICATION OF 18 U.S.C. § 3553 SENTENCING FACTORS**

A. **INTRODUCTION**

A just sentence must be in proportion to the harm caused. Crafting this sentence is not about retribution, it's about making sure that the punishment is commensurate with the gravity of the offense. See, *Ewing v. California*, 538 U.S. 11, 30, 123 S. Ct. 1179, 1190, 155 L. Ed. 2d 108 (2003)(Eighth Amendment review of California's "three strikes" law required a comparison of the gravity of the crime committed and the sentence imposed.)

B. **DISCUSSION OF THE § 3553(a) FACTORS**

(1) nature and circumstances of the offense and the history and characteristics of the defendant;

(a.) **Crack house and drug/gun lifestyle**

Everyone is familiar with the effect of drug houses – law abiding people move from the neighborhood if they can, parents who are left behind can't let their children play outside, and all who remain are inevitably surrounded by an unsafe deteriorating environment. Drug houses are a cancer that metastasize and do serious societal damage

as they spread. Congress criminalized this behavior when it passed 21 U.S.C. § 856 recognizing that drug houses destroy neighborhoods and communities.

Chris Grant lived in one of those neighborhoods. But he wasn't passively living in a rough part of town. Rather, he was an armed drug dealer who sold drugs out of his home and on the streets at all times of the day and night.

From the beginning, Grant has attempted to spin his role operating a crack house to his advantage. He's sought to mitigate this murder by claiming that he had been previously robbed of money and drugs, while insisting that he killed Trooper Hopkins because he mistook Hopkins for a potential intruder.

But is that claim really mitigating?

Everyone living on the streets, and everyone in the criminal justice system, knows that drug dealers are frequent targets for robbery because they typically have cash, along with drugs and guns (commodities that are easily converted to cash). At the same time, drug dealers are amongst the least likely to call the police when they are robbed. Grant's decision to sell drugs out of his own home, therefore, made him a stationary target. And Grant brazenly defended his criminal conduct with firearms and the threat of violence. Simply put: Grant put himself - and Nick Hopkins - in this position.

Grant knew he was involved in high-risk criminal behavior in a high-risk area. He had a choice. Rather than sleep on a gun, he could've quit selling drugs. After all, the best way to avoid being a target for robbery is to not be a drug dealer maintaining a known drug house. But Grant's answer to this risk was to accumulate more and more guns, with

more and more firepower. He didn't just have a .9mm Glock, he equipped it with a large capacity magazine. He didn't just have handguns, he also accumulated high-powered AR-15 and AK-47 style assault weapons.

But drug robberies aren't the only occupational hazard for a drug dealer. Law enforcement is the other foreseeable risk. Grant was well acquainted with that risk because he previously served a four-year prison sentence after a different search warrant was executed at his prior residence.

In other words, it isn't mitigating for Grant to claim that he mistook Trooper Hopkins for an intruder because Grant was reacting to conditions that he himself created.

**(b.)** **Nature of the Crime**

Grant also argues for mitigation because this crime happened without much time to reflect. That is true. However, if he had planned this murder and actively hunted a law enforcement officer then he would have faced first degree murder charges and a more serious risk of the death penalty. Instead, Grant faced second degree murder charges expressly because of this lack of planning. A lack of premeditation is present in all second degree murder cases, *by definition*. As such, this appeal for mitigation is a hollow argument. Reduced to its essence, this argument is basically nothing more than, "he could have committed a more egregious murder." True enough. But hardly mitigating.

And in a real sense, this crime *was* premeditated. Grant's behavior that day is fairly characterized as a conditioned response from years of living a gun and drug lifestyle. During controlled purchases with a confidential informant, Grant protected his drug

dealing enterprise with handguns and assault rifles. But a different grand jury witness also testified to Grant's armed drug dealing. (Ex. 11, p. 19-23) That person described being in Grant's home about a week before the murder and seeing cash, a baseball-sized rock of crack cocaine, and marijuana lying in plain view. (Id. at 21-23) The person told Grant, "Man, you got all this money laying out ... [s]omebody going to try to rob you." To which Grant responded that he wasn't going to be robbed because "I got this AK and this 9-millimeter." (Id. at 23)

There is a reason his home was chock-full of firearms. He imagined using them. He talked about using them. And on the night of the murder, he slept on the couch with a loaded gun in anticipation of using it. So, Grant's shoot-first reaction should come as no surprise. He was literally planning for it.

The sad part is that he had so many other options available that would have saved Nick Hopkins' life. Grant could have simply looked outside of either of the windows in his living room, he could have turned on a light, he could have called 911, or he could have simply yelled a warning to the person on his porch. He had so many choices. But he was predisposed to use deadly force, and so his default reaction was violence. Stated another way, the nature and circumstances of the offense show that this defendant was predisposed to use violence. That's aggravating evidence, not mitigating.

**(c.)** <u>**Impact of the Crime**</u>

Nick leaves behind an adoring wife, four children, and a large family. Whitney made a Facebook post on the second anniversary of Nick's passing that provides heartbreaking

context on how this crime has damaged her. (Ex. 12) But another way to illustrate the magnitude of Whitney's loss is to look at her actions after Nick's murder. Despite being a single mother already raising three young children, Whitney chose to complete the in vitro fertilization that she and Nick had begun. She carried another of Nick's children, after his death, in a tragic effort to extend the last ember of his life.

The ISP lost a good one. Nick Hopkins was a charismatic and energetic man who possessed a "larger than life" smile. He was outgoing, friendly, and left an impact on the people he met. As an example, a motorist named Cynthia Stanley ran out of gas in 2015 when the affable Trooper Hopkins arrived to help. He talked about his wife and the anticipated birth of their twins. The two shared such a warm experience that Cynthia wanted to get a picture with Nick. Years later, she recognized Nick's smile when media accounts announced his murder. Cynthia shared the picture, and her story, on Facebook as a tribute to Nick.[5] (Ex. 13) His murder is a loss to the community he served.

Law enforcement itself is also a victim of this crime. (Ex. 14) It is probably unwise to use the term "law enforcement" as a victim because that permits the reader to imagine Nick's co-workers as an entity or as a faceless unit of a police department. But these are men and women. The ISP is made up of human beings who cried, suffered, grieved, and continue to grieve over Nick's loss. These are mothers, fathers, brothers, and sisters who suffer the same emotions as anyone else when they lose a loved one.

---

5        https://fox2now.com/news/woman-recounts-2015-encounter-with-slain-illinois-state-trooper/ (visited 10/21/21)

And members of the SWAT team, in particular, form a bond that can only truly be understood by their peers. They trust one another with their lives while facing dangers that are incomprehensible to rest of us. Nick's teammates watched him be gunned down in front of them. And that is a wound that will never heal.

Society too has suffered a loss. Law enforcement has been under attack in recent years. There has been a dramatic rise in officers murdered coinciding with increased critical media coverage after a few bad actors caused the law enforcement profession to be painted with an unfortunately broad brush. These dynamics have driven many people away from a career in law enforcement and demoralized those who remain in the ranks. Crimes like this one further discourage good men and women from wanting to join law enforcement. One can ask rhetorically: how many parents today are actively encouraging their children to go into a law enforcement career?  The answer is not many, which will eventually create an even greater crisis in public safety and further deteriorate the quality of existing departments.

(d.)  **<u>Acceptance of Responsibility</u>**

The government accepts Grant's professed remorse for having killed Nick Hopkins. He asks for forgiveness. But that is one remedy the court system is not equipped to provide. Rather, forgiveness must come from within, from the victim's family, and ultimately from a far higher power.

But Grant can take a measure of solace knowing that he did the right thing by pleading guilty. It is sincerely mitigating that Grant spared Whitney Hopkins and the rest of the

family the anxiety of a federal trial. Many defendants facing criminal charges delay, obfuscate, and try to avoid responsibility for their conduct until the very end. But Grant entered a guilty plea well in advance of the scheduled trial date and permitted those who loved Nick to move towards the upcoming holiday season with this chapter behind them. While Grant cannot undo the damage he has caused, he at least did the right thing in the federal case. That shows a measure of character that is mitigating.

(e.) **Personal Characteristics of the Defendant**

Grant was raised by caring parents who spent meaningful time with him while he was young. However, Grant's father went to prison during his adolescent years.

Grant described his childhood neighborhood as dangerous and riddled with drugs, guns, and violence. His neighborhood was so unsafe that his mother did not allow him to play outside after school. He recalled childhood incidents involving fights, shootings, and even a neighborhood murder.

How ironic.

Grant created those very same conditions for another generation of children in East St. Louis. But this time, *he* was responsible for the crack house. *He* polluted his neighborhood with drugs and guns. *He* was the reason that children in his neighborhood weren't allowed outside after school. And how many children growing up around North 42nd Street will be scarred by the murder that *he* committed?

It's also not just neighborhood children he's affected. Grant experienced life growing up with an incarcerated father. Now he has sentenced his own children to the same fate.

And it should be emphasized that the ISP has maintained a heightened presence in East St. Louis specifically to combat the very drug and gun issues that people like Chris Grant have created. An incredible amount of state and federal resources pour into this community to combat the drug and gun violence epidemic because it has decimated that community and threatens the futures of the children exposed to those conditions. Nick Hopkins and the rest of the ISP team were present to try to make that community safer from drug dealers like Chris Grant.

So, Grant cannot seriously seek leniency for growing up in the very same conditions he created for the next generation. He's simply forfeited any moral argument for leniency by perpetuating the very same harm to countless others. And it's not like he's a young kid. He's a 47-year-old man who ought to know better.

Grant's criminal history is predictable for a federal offender. His life has been characterized by persistent, street-level, criminal offenses. He has multiple convictions for unlawful possession of a controlled substance:

- The first occurred while Grant was unlawfully carrying a concealed pistol;
- The second occurred after a vehicular and foot chase;
- The third resulted after state prosecutors dismissed charges for selling cocaine to an undercover officer within 1,000 feet of a school; and
- The fourth conviction resulted from a different search warrant that was executed at his home.

Grant also has numerous traffic offenses, a conviction for obstructing and resisting a police officer, and a Missouri conviction for possession of cannabis and possession of drug paraphernalia. Unsurprisingly, there is also a history of probation violations.

Grant's history of substance abuse is also typical of many federal offenders. What began as casual alcohol and marijuana use escalated to powder cocaine, until Grant eventually turned to crack.

Much of Chris Grant's family has been involved with the criminal justice system. His father was incarcerated while he was between the ages of 5-16. One of his brothers is currently incarcerated. One of his sons is recovering from being shot several times, while another son is himself currently incarcerated.

Despite that turbulent background, it appears that Grant has been an involved member of his family maintaining a number of long-term relationships. He has fathered eight children ranging in ages from six to 27.[6] His lack of employment history limits the extent to which he could have regularly provided for these children.

There is scant evidence that Grant has ever contributed to society. He was failing his junior year of high school and withdrew for nonattendance. In 47 years of life, it is remarkable that only a single month of employment history was confirmed. One month. Similarly, he has no credit history. There is no evidence of volunteerism, military service, or other contributions to society.

On balance, his personal characteristics are aggravating factors for sentencing.

(2) <u>need for the sentence imposed to accomplish each of the purposes of sentencing</u>;

Three of the four statutory purposes of sentencing would be served if the Court were to impose a life sentence. The fourth purpose is not applicable.

---

6        Interestingly, five of the eight children's names begin with a variation of "Chris."

The first asks the Court to consider the nature of the offense. The law commands that the sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Simply put, the murder of a police officer is amongst the most serious of offenses and demands an extraordinarily severe sentence.

The same holds true for the second – affording adequate deterrence to criminal conduct. General deterrence is served by recognizing the social harms resulting from maintaining a drug house, along with the obvious need to deter people from wantonly using firearms. Specific deterrence would be served by imposing a substantial sentence against a person who's been involved in a drug-involved lifestyle for three decades.

The third purpose of sentencing centers on incapacitation to protect the public from further crimes of the defendant. A lengthy sentence would serve this purpose to address the defendant's penchant for illegal firearms to protect his crack house.

The fourth purpose of sentencing is not applicable. This last statutory purpose is to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. At age 47, there is little in the way of vocational training that can be done for Grant. Additionally, it should be remembered that Grant faces a 45-year minimum sentence in state court if convicted of substantially similar charges.

Therefore, § 3553(a)(2) suggests that a very substantial sentence is required.

(3) kinds of sentences available to the Court;

The statutory range of penalties reflects the incredibly serious nature of these crimes. The four drug counts are each punishable by up to 20 years' imprisonment. The possession of a weapon by a felon count is punishable by up to 10 years' imprisonment. And the defendant faces a mandatory consecutive sentence of up to life imprisonment for murder.

Federal crimes simply don't get more serious than this. And the range of available penalties reflects that fact.

(4) the Sentencing Guidelines;

Counts 1, 2, 3, 5, and 8 are grouped together and will receive a guideline range and sentence. Count 7 alleges a violation of 18 U.S.C. §924(j), which is a mandatory minimum, mandatory consecutive, charge. As such, it will receive its own guideline range and sentence – "*to be imposed independently.*" §2A1.2, §3D1.1(b)(1), §5G1.2(a).

The GLR for the grouped counts is controlled by §2A1.2, which results in Offense Level 37, Criminal History Category III, with an advisory imprisonment range of 262-327.

The GLR for Count 7 is also controlled by §2A1.2, again resulting in Offense Level 37, Criminal History Category III, and an advisory imprisonment range of 262-327.[7]

The cumulative effect is a sentence range of 524-654 months. This applicable guideline range also testifies to the seriousness of the crimes.

(5) relevant policy statements issued by the Sentencing Commission;

None are relied upon.

---

[7]     Grant was convicted of §924(j), which is a separate offense than §924(c). The GLR for §924(c) offense is the minimum term required by the statute. §2K2.4. However, §924(j) has no such limitation. Appendix A directs the GLR for second degree murder under §924(j) is controlled instead by §2A1.2.

(6) <u>need to avoid unwarranted sentencing disparities among similarly situated defendants</u>;

Fortunately, there isn't a representative data set for comparison of those convicted of second degree murder of a police officer in federal court. As such, a meaningful assessment between similarly situated defendants is not possible.

(7) <u>need to provide restitution to the victims</u>.

Grant will never provide any remuneration to Nick's family.

## IV.   <u>CONCLUSION:</u>

Other than remorse and a timely acceptance of responsibility, it is difficult to find much mitigation. It is no defense for Grant to argue that he did not know it was a police officer on his porch. That argument implies that the shooting wouldn't have been serious if instead he had murdered a drug customer, someone making an Amazon delivery, a relative who dropped by, or other person who happened to be on the porch. It is no mitigation that Grant didn't expect to be in a federal court room facing these charges, because his gun and drug lifestyle comes with very foreseeable results.

Rather, this crime illustrates the reason why we have a maintaining a drug house statute. It illustrates why felons and drug dealers are prohibited from possessing firearms. And it illustrates the great contrast between a street-level offender who harmed society, compared to a hero who sacrificed his life to protect it.

Nick's murder is wrong on so many levels. It deprived Nick's children of their father, Whitney of her husband, and James and Verna of their son. It devastated the Illinois State

Police. And it dealt another blow to a community already plagued with the highest per capita murder rate in America.[8] Nick's courage and public service was cruelly penalized, and his life was taken from him in an instant, simply because of a drug dealer's response to his own lifestyle. It is an immeasurable harm that can never be made right. The best the Court can hope to do is impose a sentence in proportion to the gravity of the offense. Accordingly, the government recommends the Court impose a life sentence.

Respectfully submitted,

UNITED STATES OF AMERICA,

STEVEN D. WEINHOEFT
United States Attorney

*s/ Steven D. Weinhoeft*

Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail: Steven.Weinhoeft@usdoj.gov

*s/ Ali M. Summers*

ALI M. SUMMERS
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
Email: Ali.Summers@usdoj.gov

---

8        https://www.neighborhoodscout.com/blog/highest-murder-rate-cities-2020 (visited October 19, 2021)