BEFORE THE UNITED STATES GRAND JURY

SOUTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE:  THE MATTER OF:

CHRISTOPHER R. GRANT

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Transcript of Testimony

of

███████████████████

November 19, 2019

APPEARANCE:    ALI M. SUMMERS AND KARELIA RAJAGOPAL
               Assistant U.S. Attorneys
               Melvin Price Federal Building and
               United States Courthouse
               750 Missouri Avenue
               East St. Louis, Illinois  62201

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BLACKBURN REPORTING, LLC

GOVERNMENT
EXHIBIT
11

1   ████████████████████████,

2   being first duly sworn, testified as follows:

3   QUESTIONS BY MS. SUMMERS:

4        Q.   Okay.  So it's important, with all the questions

5   that I ask of you, that the court reporter and the grand

6   jurors hear everything that you say, so if you can talk

7   into the microphone, that -- that's what works the best.

8   Okay?

9        A.   Yes, ma'am.

10       Q.   And try it out.

11       A.   Yes, ma'am.

12       Q.   There you go.  All right.  Could you please state

13   and spell your name for the record.

14       A.   ████████████████████   ████████████████

15   ████████████████████████

16       Q.   Okay.  I'm just going to move this a little

17   closer to you.  Just talk right into it.  Okay?

18       A.   ██, ma'am.

19       Q.   █████████ how old are you?

20       A.   █

21       Q.   What's your date of birth?

22       A.   ████████.

23       Q.   And do you go by any nicknames?

24       A.   Yes, ma'am.

25       Q.   What's your nickname?

```
 1         A.   ███████ ███████████ .
 2         Q.   ██████ ?
 3         A.   ██████ , yeah.
 4         Q.   Does anybody call you "██████
 5         A.   Yes, ma'am.
 6         Q.   Have they called you █████ for a long time?
 7         A.   Yeah.
 8         Q.   Okay.  And where do you live, ████ ███████ ?
 9         A.   ████ ██████ █████ .
10         Q.   Now, is that --
11         A.   ████████ ███████ █████ .
12         Q.   █████████████ █████ .  How long have you lived
13    at that address?
14         A.   ████████████ .
15         Q.   Who lives there with you?
16         A.   █████ .
17         Q.   █████████ ?
18         A.   ██████████ .
19         Q.   █████████ ?
20         A.   Yes, ma'am.
21         Q.   ████████████████████████████ ██ ██████ ?
22         A.   ██████ ███████████ .
23         Q.   █████████ ?
24         A.   Yes, ma'am.
25         Q.   ████████████ ?
```



```
 1      A.      ██████████████████████████████████.

 2      Q.      ████████████████████████████

 3      A.      ███████████████████████.

 4      Q.      Do you work?

 5      A.      No, ma'am.

 6      Q.      Do you obtain any Disability --

 7      A.      Yes.

 8      Q.      -- checks?

 9      A.      Yeah, I get Disability.

10      Q.      You get Disability?

11      A.      Yes, ma'am.

12      Q.      And how often are you -- do you receive those

13   checks?

14      A.      Once a month.

15      Q.      Okay.  And do you know a person by the name of

16   Christopher Grant?

17      A.      Yes, ma'am.

18      Q.      How do you know Mr. Grant?

19      A.      ██████████████.

20      Q.      And what is that relationship?

21      A.      ██████████████.

22      Q.      ███████████████?

23      A.      Yes, ma'am.

24      Q.      And how long -- so you've known Christopher Grant

25   the entire time ████████████████████████?
```

```
 1        A.    I've been knowing him a long time, but I hadn't
 2   seen him in -- I hadn't seen him in about ten years.
 3        Q.    And -- and --
 4        A.    Then had ran back into him.
 5        Q.    Okay.  How -- when -- does Chris -- let me ask
 6   this: ██████████████████      ████████████████
 7   ████████████████████████████ ?
 8        A.    Uh-huh, my whole life, yeah.
 9        Q.    Yeah, your whole life?
10        A.    Yeah.
11        Q.    And -- and Christopher Grant is from East St.
12   Louis ██████████
13        A.    Yes, I guess so.  Yes, ma'am.
14        Q.    All right.  And so there was a time that he
15   was -- didn't live in East St. Louis, but then he recently
16   -- then you started seeing him in East St. Louis again --
17        A.    Yes, ma'am.
18        Q.    -- recently?  And approximately when was that?
19        A.    Earlier this year, early part of this year.
20        Q.    Sometime after Christmas?
21        A.    Yes, ma'am.
22        Q.    Maybe January of this year?
23        A.    Yes, ma'am.
24        Q.    And how did that come about that you saw him
25   again?
```

1    A.    He was riding.  I think he was riding.  No, he

2    was walking because he didn't have the truck, and he -- he

3    just -- and he was like -- I said, "Where you been?"  He

4    said, "I been to Springfield," where his daughter at, and

5    he was telling me that he had some more -- you know, some

6    dope, you know, because he knew I got high at that time.

7        Q.    Okay.  So you -- you saw him back in the East St.

8    Louis area, and you knew he'd been gone to Springfield,

9    Illinois, for a while?

10       A.    I didn't know where he had been, but he told me

11   that's where he been, to Springfield.

12       Q.    Okay.  And then where was he living when you saw

13   him again in January of this year?

14       A.    On 42nd.

15       Q.    On 42nd Street?

16       A.    Yes, ma'am.

17       Q.    Do you know the address of the place he was

18   staying?

19       A.    Not -- not right off.

20       Q.    Can you describe the place that he was staying?

21       A.    Yes.  A brick tenant -- tenant-like house.  You

22   know, it's got two sides.

23       Q.    It's like a duplex, kind of?

24       A.    Yes, ma'am.

25       Q.    And that was on 42nd Street in East St. Louis;

1    correct?

2         A.   Yes, ma'am.

3         Q.   I'm going to show you a picture of -- or I'm

4    going to show you what's been marked as Grand Jury Exhibit

5    10.  Do you recognize what's depicted in that picture?

6         A.   Yeah.  This is the house there.

7         Q.   What is it?

8         A.   That's -- that's the duplex there.

9         Q.   That's the duplex where Chris Grant was living?

10        A.   Yes, ma'am.

11        Q.   And that house had two doors in the front;

12   correct?

13        A.   Yes, ma'am.

14        Q.   And which side of that house did he live on?

15        A.   The right.

16        Q.   The right side.  So you would go -- you had been

17   to that -- you have been to that house?

18        A.   Yes, ma'am.

19        Q.   And you -- and was Chris Grant living there with

20   anybody else that you were aware of?

21        A.   Not that I'm aware of.

22        Q.   Okay.  And so one of the first times that you see

23   him again this year in 2019, he tells you that he had some

24   crack?

25        A.   Yes, ma'am.

| 1 | Q. | Did he tell you that he was selling crack or he |
|---|---|---|
| 2 | had -- | |
| 3 | A. | Yes. |
| 4 | Q. | -- crack to sell? |
| 5 | A. | Yes, ma'am. |
| 6 | Q. | And at that time you did use crack cocaine? |
| 7 | A. | Yes, ma'am. |
| 8 | Q. | And have you since stopped? |
| 9 | A. | Yes.  I'm like 40 days clean. |
| 10 | Q. | 40 days clean? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | All right.  So up until 40 days ago, you were |
| 13 | using -- | |
| 14 | A. | Yes, ma'am. |
| 15 | Q. | -- crack?  And did he offer to sell you some |
| 16 | crack? | |
| 17 | A. | Yes, ma'am. |
| 18 | Q. | All right.  And did you buy crack from him? |
| 19 | A. | Yes, on a couple occasions, like two or three |
| 20 | time. | |
| 21 | Q. | Two or three times every week? |
| 22 | A. | Probably -- probably like twice a week. |
| 23 | Q. | Twice a week? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | So once you reconnect with him, you started |

1    buying your crack from him?

2         A.    Yes, ma'am.

3         Q.    Did you buy your crack from anybody else?

4         A.    No, ma'am.

5         Q.    And when -- when you went to buy crack from Chris

6    Grant, would you buy it out of this house on 42nd Street?

7         A.    Yeah, or he -- or out of his truck.

8         Q.    Or out of his truck?

9         A.    (Nonverbal response.)

10        Q.    Okay.  And so from about January when you started

11   or that you started buying from him every week for two

12   times a week?

13        A.    Yes, ma'am.

14        Q.    And how much would -- how much would you buy from

15   him?

16        A.    More than 20 or $30.

17        Q.    20 to $30 worth of crack cocaine?

18        A.    Yes, ma'am.

19        Q.    And how much would that get you?

20        A.    Pretty nice piece.

21        Q.    A nice piece?

22        A.    Uh-huh.

23        Q.    Do you know how many grams that is?

24        A.    No, ma'am.

25        Q.    Can you show the grand jury about how big of a

1    piece it would be?

2         A.    Probably about like that.

3         Q.    About that big?  About an inch?

4         A.    Yes, ma'am.

5         Q.    And then would that be one use?

6         A.    One piece.

7         Q.    You --

8         A.    One piece.

9         Q.    I -- say that again.

10        A.    That would be just one piece like that.

11        Q.    So when you say "one piece," is that -- do you

12   smoke that all at one time?

13        A.    No.

14        Q.    How long would that take you to smoke it?

15        A.    About a hour.

16        Q.    A couple days?  A couple times?

17        A.    Well, what you mean a couple time?

18        Q.    Well, I just need you to explain for the grand

19   jury kind of how long that would last.

20        A.    About an hour.

21        Q.    About an hour?

22        A.    Yes, ma'am.

23        Q.    All right.  So you -- but -- so that would be one

24   time of getting high; is that right?

25        A.    Yeah.  Like -- yeah.

| | | |
|---|---|---|
| 1 | Q. | Okay.  And when you would -- when you went to buy |
| 2 | | crack from him, would you tell him how much you wanted to |
| 3 | | buy? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | And, typically, it was 20 to $30 worth? |
| 6 | A. | (Nonverbal response.) |
| 7 | Q. | And how would you pay him?  In cash? |
| 8 | A. | Most the time I -- when I did get it to him, I |
| 9 | | probably bought some from cash, with cash, probably one |
| 10 | | time, but the other times it'd be like until I get my |
| 11 | | check. |
| 12 | Q. | So he would give it -- he would front it to you? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | And he would give it to you without him -- you |
| 15 | | having to pay money for it, but then did he expect you to |
| 16 | | pay money for it later? |
| 17 | A. | Uh-huh. |
| 18 | Q. | And -- |
| 19 | A. | Yes, ma'am. |
| 20 | Q. | -- when were you expected to then pay the money? |
| 21 | A. | On the 1st. |
| 22 | Q. | On the 1st? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | And why was that on the 1st? |
| 25 | A. | Because that's when I got my check. |

1      Q.   When you got your Disability check?

2      A.   Yes, ma'am.

3      Q.   Did you always make good on that amount that you

4  would owe --

5      A.   Yeah.

6      Q.   -- him?

7      A.   Yes, ma'am.

8      Q.   Did he keep track of that amount that you would

9  owe him?

10      A.   Yes, ma'am.

11      Q.   How did you know that?

12      A.   Because every time I come up, he know -- he know

13  exactly what everybody -- what everybody owed.

14      Q.   He always knew what you owed?

15      A.   (Nonverbal response.)

16      Q.   Did he have it written down somewhere?

17      A.   Nah.

18      Q.   He had it up in his mind, in his head?

19      A.   I ain't never seen -- he probably did have it

20  wrote down, but I ain't never see it.

21      Q.   All right.  But he would tell you how much you

22  owe?

23      A.   Yes, ma'am.

24      Q.   Until you paid it back?

25      A.   Yes, ma'am.

```
1         Q.    Do you know if he sold any other types of drugs?

2         A.    No, ma'am.  I'm not -- I'm not for sure if he

3    sold reefer because he kept a lot of reefer, but I never

4    bought any from him.

5         Q.    Okay.  So "reefer," you mean cannabis?  Weed?

6         A.    Yeah.

7         Q.    You never bought --

8         A.    No.

9         Q.    -- weed from him?  Do you -- did you smoke weed

10   at --

11        A.    Yes, ma'am.

12        Q.    -- that time, too?

13        A.    Yes, ma'am.

14        Q.    Okay.  And so when you would -- when -- you

15   bought crack from him a couple times a week for how long?

16        A.    For about four months.

17        Q.    About four months?

18        A.    Yes, ma'am.

19        Q.    And then what happened?

20        A.    That's when he end up catching that case he got

21   now.

22        Q.    All right.  So you're aware that on August 23rd

23   of this year he shot a --

24        A.    Yes, ma'am.

25        Q.    -- Illinois State Police officer?
```

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | And killed him? |
| 3 | A. | Yes, ma'am. |
| 4 | Q. | All right. So leading up to that day, you would |

see Chris Grant on a weekly basis, would you say?

| | | |
|---|---|---|
| 6 | A. | Oh, before that, before he had caught the case? |
| 7 | Q. | Yeah. |
| 8 | A. | Yeah, probably -- |
| 9 | Q. | And when -- |
| 10 | A. | -- twice a month. |
| 11 | Q. | Probably twice a week? |
| 12 | A. | Probably that. Probably about four time I dealt |

with Chris.

| | | |
|---|---|---|
| 14 | Q. | Four times that you dealt with him? |
| 15 | A. | Yeah, bought -- when I bought some dope from him. |
| 16 | Q. | So I just want to be clear because you've said |

that you -- you have -- would buy crack from him twice a
week for about four months.

| | | |
|---|---|---|
| 19 | A. | Yes, ma'am. |
| 20 | Q. | Does that sound right? So that would be a whole |

lot more than four times, is that right, that you would see
him?

| | | |
|---|---|---|
| 23 | A. | Yeah, you can say that, ma'am. |
| 24 | Q. | Okay. And when you went to buy the crack, did |

you typically go to his house on 42nd Street?

1    A.    No.   I went to the house probably about twice,

2    and the other times I -- he -- you know, he will probably

3    come over to my house, or I'll see him in the streets in

4    his truck.

5         Q.    Did -- when you went to his house, would you go

6    in -- did you go into the right side of the house?

7         A.    Yes, ma'am.

8         Q.    And how many times did you go inside the house?

9         A.    Probably twice.

10        Q.    Two times that you went inside the house?

11        A.    Yes, ma'am.

12        Q.    And those two times that you went inside the

13   house, did -- why did -- why did you go in those two times?

14        A.    The first time I went in because, like I said, he

15   had been gone.  I ain't seen him in a while, so I just came

16   by to see him and visit, well, talk with him.  I had really

17   trying to get me a piece of dope, too, though, but anyway,

18   he -- when I sit over there with him, I didn't know he got

19   high, so me and him started getting high, and he -- that's

20   when he was telling me don't be telling nobody, you know,

21   he smoke, though, so I stayed over there with him.  Now,

22   that's one particular time I did go over there and stay

23   over there for a while.  I stayed over there about a couple

24   hours.

25        Q.    And you guys smoked crack that --

1       A.    Yes, ma'am.

2            Q.    -- that day?  And where -- so can you describe

3       what that apartment or that house looked like?

4            A.    It looked like it was a place you just sit and

5       sell dope because there wasn't nothing in there but a -- a

6       TV and a couch.

7            Q.    All right.  So did you only go into the living

8       room part of the house, or did you go back --

9            A.    No farther.

10           Q.    -- into the kitchen and the bedroom?

11           A.    No farther than the living room.

12           Q.    All right.  And so that first time that you went

13      in there, you guys sat on the couch in -- couch there in

14      the front living room and smoked crack?

15           A.    Yes, ma'am.

16           Q.    And you were there for a couple hours?

17           A.    Yes, ma'am.

18           Q.    And is that the time -- that's the time that he

19      pretty much told you that he -- he sells crack?

20           A.    Yes, ma'am.  No.  He told me that before then,

21      and that's why I came over there.

22           Q.    Okay.  Did -- while you were there, did anybody

23      come to the house to buy crack from him?

24           A.    Nope, ain't nobody really came because I think

25      because he had just got back, so people probably didn't

1  know that he was really there, no.

2      Q.   All right.

3      A.   But, no, didn't nobody come by when I was over

4  there.

5      Q.   Okay.   And then after that, you started buying

6  from him regularly every week?

7      A.   Yes, ma'am.

8      Q.   And were there other times that you would go to

9  the house and just go up on the porch to get the crack from

10 him?

11     A.   Yeah, just sit on the porch.

12     Q.   And so tell us how that would go on those -- on

13 those occasions.

14     A.   Oh, I would come up, and -- and he'll come to the

15 door.   I'll sit on the porch, and he'll come out asking me

16 if -- if I'm trying to get something.   You know, like I

17 said, most the time I'll get it on credit, you know, so

18 that's why I just sit there and try to talk for a minute

19 before I can get me some, but anyway, he'll come and sit

20 out, and I'm like, "Man, let me get a dime.   I'll give you

21 20 back on the 1st," and he'll let me get it.

22     Q.   Okay.   So those times you would stay out on that

23 porch, and he would go inside and --

24     A.   And get it.

25     Q.   -- get -- get the crack and bring it back out to

```
1    you?

2         A.   Yes, ma'am.

3         Q.   Did he bring it out in a baggy or --

4         A.   No.

5         Q.   -- just --

6         A.   In his hand.

7         Q.   Just in his hand?  Just the rock of crack and

8    handed it to you?

9         A.   Uh-huh.

10        Q.   And then you'd promise to pay him on the 1st?

11        A.   Yes, ma'am.

12        Q.   Was there -- were there times that you would go

13   to his house to -- to buy crack and there were other people

14   there?

15        A.   I only went one time, and they was working on the

16   duplex next-door.

17        Q.   On the left side of the house?

18        A.   Over there.

19        Q.   All right.  So we'll talk about that here in just

20   a minute.  When you went to his house or when you were

21   going to buy crack, did you ever call him ahead of time, or

22   did you just walk up to the house?

23        A.   Nah, I just come up.  I have to because, you

24   know, I don't carry a phone.  I don't have a cell phone.

25        Q.   You don't have a phone, so you just have to try
```

```
1    to catch him at home?

2         A.   Yeah.

3         Q.   Was it hard to catch him at home or at that

4    house?

5         A.   Not for real.  You know, East St. Louis ain't

6    that big, so...

7         Q.   Okay.  So you know -- you'd see him out --

8         A.   Uh-huh.

9         Q.   -- and you'd walk up?  When you would buy crack

10   from him, did -- did you see him with a gun?

11        A.   Yes, ma'am.  It would be in his pocket.

12        Q.   And what kind of gun was it?

13        A.   Like a 9.

14        Q.   9-millimeter?

15        A.   Yes, ma'am.

16        Q.   And can you describe what it looked like?

17        A.   It looked black.  The handle was black.

18        Q.   The handle was black?

19        A.   Yes, ma'am.

20        Q.   And he kept it in his pocket?

21        A.   Yes, ma'am.

22        Q.   Which pocket?

23        A.   I guess this one.

24        Q.   On the right side?

25        A.   It had to be one he could use that.
```

1   Q. Did you ever see him pull it out of his pocket

2 while you were with him?

3   A. No, ma'am.

4   Q. But you knew that he had it?

5   A. Yes, ma'am.

6   Q. Would you ever talk -- ask him about the gun?

7   A. I be telling him -- I always -- if I don't see it

8 on his -- in his pocket, I'm like, "Man, where that gun

9 at?" you know.

10   Q. Why did you ask him that?

11   A. I just be wanting -- because, you know, I be -- I

12 be leery about guns.  You know, I'm like held tight, but

13 man, what you -- because every time I see him, he have it,

14 so if I ain't see it, I'm like, "Where that gun at?"

15   Q. Okay.

16   A. And he says, "In there on the couch."

17   Q. And he -- and there were times that it was inside

18 on the couch?

19   A. Sitting on the couch, yeah.

20   Q. If he didn't have it in his pocket?

21   A. Yes, ma'am.

22   Q. But every time that you saw him, he had that gun?

23   A. Yes, ma'am.

24   Q. And did you ever see him with any other guns?

25   A. No, ma'am.

1      Q.   Did you ever talk to him about whether he had any

2   other guns?

3      A.   Yeah.  He had mentioned that he had a AK or

4   something like that, a rifle.

5      Q.   All right.  So will you tell me -- let's -- tell

6   us about the time that you talked to him about having an

7   AK.  Were you in the house that time?

8      A.   Yeah.  That was the day that we was sitting there

9   getting high.

10      Q.   All right.  Was that pretty close in time to when

11   he was arrested on --

12      A.   Yes, ma'am.

13      Q.   -- the -- the --

14      A.   A couple weeks.

15      Q.   -- shooting?

16      A.   Yeah.

17      Q.   Okay.

18      A.   A couple weeks after.

19      Q.   So this was the second time that you were in his

20   house inside the house getting high with him; right?

21      A.   Yes.

22      Q.   And about how long before the shooting was that?

23      A.   About a week, a week after.

24      Q.   About a week?

25      A.   About a week after that.

1        Q.    A week before?

2        A.    Yeah.

3        Q.    Okay.  And so when -- you were inside the house

4    again in that living room?

5        A.    (Nonverbal response.)

6        Q.    And what did it look like in the living room that

7    time?

8        A.    Like a crack house to me.

9        Q.    Okay.  Did he have some -- some of the drugs out?

10       A.    Yeah, out on the couch.

11       Q.    Can you describe that for the jury?

12       A.    Just money and drugs spread out on the couch.

13       Q.    And how much money are we talking about?

14       A.    A lot.

15       Q.    A lot of money?

16       A.    Yes, ma'am.

17       Q.    Was it -- was it in stacks, or was it --

18       A.    Just spread out.

19       Q.    -- like fanned out?  Spread out all over?

20       A.    (Nonverbal response.)

21       Q.    And then drugs, what -- was it crack that you

22   saw?

23       A.    Weed, reefer, and crack.

24       Q.    All right.  And how -- can you describe how big

25   of a piece of crack?

1    A.    Probably about an ounce.

2    Q.    So like the size of maybe a baseball?

3    A.    Yeah.

4    Q.    And was -- would he -- was that all put together,

5    or was -- was --

6    A.    Together.

7    Q.    -- it cut up?  Huh?

8    A.    Together.

9    Q.    All right.  And he had that out on the couch and

10    then some weed?

11    A.    Uh-huh.

12    Q.    And did you say anything to him that time about

13    it?

14    A.    I just -- yeah, I think I asked him why he be

15    having all this stuff laying out like that, and then he was

16    like -- no.  I think I asked him.  I said -- I told him --

17    I said, "Man, you got all this money laying out."  I said,

18    "Somebody going to try to rob you."  He like, "No, they

19    ain't."  That's when he telling me about the AK.

20    Q.    So what exactly did he say?  So you said --

21    A.    Like he didn't worry about nobody robbing him.

22    He said, "I got this AK and this 9-millimeter."

23    Q.    And that was about a week before the shooting?

24    A.    Yes, ma'am.

25    Q.    Did you see that AK?

```
1        A.    No, I didn't see the AK.

2        Q.    But he described it?

3        A.    No.  He just be telling me.

4        Q.    Or he told you he had it?

5        A.    Yeah.

6        Q.    Did he tell you where he kept it?

7        A.    No, ma'am.

8        Q.    Okay.  And were there other times that you would

9   smoke crack with him not at his house?

10       A.    No.

11       Q.    Were there times --

12       A.    I only smoked -- I only smoked -- I only smoked

13  with him once.

14       Q.    Or two times, you've testified?

15       A.    No.  The second time we smoked reefer in the

16  park.  Remember, I told you that

17

18       Q.    Right.

19       A.    And he came out.  You know, he found me, and we

20  sit and smoked a lot of reefer that day.

21       Q.    All right.  Were there other times that you would

22  smoke reefer or weed in his vehicle?

23       A.    Yeah, we ride all the time.

24       Q.    What kind of car did he have?  All the time?

25       A.    Cadillac truck.  Every time I get in the truck
```

```
 1      with him, we fire -- you smoking a blunt or something, you

 2      know.

 3           Q.   And that would be driving around in his car?

 4           A.   Yes, ma'am.

 5           Q.   And what kind of car did he drive?

 6           A.   A Cadillac truck.

 7           Q.   And what color was it?

 8           A.   Reddish-maroon.

 9           Q.   So that was in these months leading up to the day

10      of the shooting?

11           A.   Yes, ma'am.

12           Q.   And so you testified that you smoked crack with

13      him two times?  The first time like --

14           A.   Once.  We smoked crack once.

15           Q.   So that last time --

16           A.   Or the first time I came over.  The second time I

17      came over, I had came over just to, you know --

18           Q.   Just to buy crack?

19           A.   -- just to get me some from him.

20           Q.   And that second time that you went into his house

21      that week before the shooting, that's when you saw all the

22      drugs and money --

23           A.   Uh-huh.

24           Q.   -- laying out?

25           A.   Yes, ma'am.
```

1        Q.    But you didn't smoke crack that time?

2        A.    No.  I just had gotten me some and left.

3        Q.    And then left.  All right.  And then you've been

4    interviewed by Illinois State Police agents about -- in

5    which they were asking you these same questions; is that

6    right?

7        A.    Yes, ma'am.

8        Q.    And did you give them the same answers?

9        A.    Yes, ma'am.

10       Q.    And that interview was videotaped.

11       A.    Yes, ma'am.

12       Q.    Is that right?  And so you have a few felony

13   convictions; is that correct?

14       A.    Yes, ma'am.

15       Q.

16

17

18

19

20

21

22

23

24

25





```
 1    Q.
 2    A.
 3    Q.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22          ma'am.
23
24
25
```



1       Q.

2       A.

3       Q.

4       A.

5       Q.

6       A.

7       Q.

8       A.

9       Q.

10      A.

11      Q.

12

13

14      Q.      And have you been charged or convicted of any

15      other felonies since that time?

16      A.      No more.

17      Q.      And that was in 2004?

18      A.      Yes, ma'am.

19      Q.      Was the last conviction?

20      A.      Yes, ma'am.

21      Q.      And you haven't had any other felony charges or

22      convictions since that time?

23      A.      No, ma'am.

24      Q.      Okay.

25              MS. SUMMERS:   I have no other questions for this

1    witness.  Do any of the grand jurors have any questions?

2              JURORS (Collectively):   (No response.)

3              MS. SUMMERS:   Okay.   Thank you.

4              THE WITNESS:   Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that these are the original notes and records
recorded by me of the testimony taken and the proceedings
held in the case of:

IN RE:   THE MATTER OF:

CHRISTOPHER R. GRANT,

before the United States Grand Jury, Southern District of
Illinois, on the 19th day of November, A.D., 2019.

December 9, 2019

Date

*Courtney B. Tallman*

Courtney B. Tallman